Filed 8/4/23  P. v. Lee CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C096422 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF20-0003863) |
| v. | |
| ARLYSS WALKER LEE, | |
| Defendant and Appellant. | |

Defendant Arlyss Walker Lee, a combat veteran, stabbed his girlfriend in the leg after she refused to leave his trailer.  After the trial court denied his petition for pretrial mental health diversion under Penal Code[1] section 1001.36, defendant pled no contest to three counts of corporal injury to a cohabitant, assault with a deadly weapon, and three

---

[1] Undesignated statutory references are to the Penal Code.

1

counts of vandalism and admitted a prior serious felony conviction and a prior strike in exchange for a stipulated term of 24 years in state prison.

Defendant appeals, arguing the trial court abused its discretion in denying his petition for mental health diversion. Defendant specifically challenges the trial court's findings that there was no evidence he would comply with a treatment plan; that there was no evidence of a treatment program suitable to his needs; and that he posed an unreasonable risk to public safety if treated in the community.

We conclude the trial court did not abuse its discretion in denying defendant's petition for pretrial mental health diversion based on the lack of an adequate treatment plan to address defendant's specific mental health needs. We shall affirm the trial court's order denying the petition, and given our conclusion, we do not reach defendant's remaining contentions on appeal. We affirm the judgment.

BACKGROUND[2]

A.      *The Stabbing*

In June 2020, Shasta County Sheriff's deputies were dispatched to a reported stabbing at a motel trailer space where defendant lived in a fifth-wheel trailer. There, they found the victim, T.M., sitting outside a neighboring trailer with a stab wound to her thigh. Defendant emerged from his trailer crying, stating that he "did it but it was an accident." He was taken into custody.

T.M. told the responding officer that she and defendant had been dating for approximately six months but did not live together. That day they argued while she sat on defendant's bed in his trailer. Defendant had been drinking and was upset; he asked her to leave his trailer multiple times, but she refused because she wanted to help defendant. Defendant stabbed the countertop one time with his Ka-Bar knife from the

---

[2] The parties stipulated to the police report and defendant's testimony at the diversion hearing as the factual basis for defendant's plea.

Marine Corps, and then attempted to stab the bed next to her but stabbed the knife into her thigh instead. T.M. repeatedly stated that defendant did not mean to do it.

The neighbor reported that she had called law enforcement earlier to report a disturbance involving defendant; at the time, he had been drinking and was outside his trailer with no shirt or pants, yelling unknown things at her. Later, the neighbor heard defendant and T.M. arguing inside defendant's trailer. She then heard glass break and T.M. scream. Shortly thereafter, T.M. walked out of defendant's trailer yelling to "call the cops" because she had just been stabbed. Defendant came out of the trailer looking shocked and confused; he asked what happened and stated that he did not mean to do it and that he tripped. While the neighbor called police, she saw defendant take several items to a dumpster across the street. According to the neighbor, T.M. kept blaming herself for the incident.

The trailer park manager said she had witnessed defendant acting erratically after drinking on multiple previous occasions. When she saw T.M. shortly after the stabbing, she heard T.M. say that defendant had stabbed her on purpose.

An officer interviewed defendant while seated in the back of a patrol car. The officer smelled a strong odor of alcohol coming from defendant and noticed that his speech was slurred, and he was very fidgety.

Defendant admitted stabbing T.M. but claimed he did not mean to and asked if she was okay. After being given *Miranda*[3] warnings, defendant told the officer that he and T.M. had dated in the past and that they were arguing in his trailer while he was cutting onions. At some point, T.M. got up and walked outside and they continued to argue. Defendant walked to the doorway and tripped on one of his kittens, falling into T.M. as she stood outside. At first, he did not know what happened, but he heard T.M. yelling at

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

him and he noticed blood on her leg. He was unsure what knife he had stabbed her with, but he thought it was a kitchen knife; he was not sure where he had put the knife.

After defendant consented to officers searching his trailer, they located a black Ka-Bar-style knife with a six-inch blade and a paracord wrapped around the handle in the back of a kitchen drawer behind other kitchen knives and utensils. The Ka-Bar knife appeared to have remnants of blood and soap on it, and the knife appeared wet from having recently been washed; no other utensils in the drawer were wet.

### B. The Charges

In August 2020, defendant was charged with one count of corporal injury to a spouse or cohabitant (§ 273.5, subd. (a); count 1) and assault with a deadly weapon, a knife (§ 245, subd. (a)(1); count 2). It was further alleged that defendant had two prior strikes (§ 1170.12) based on a 2014 dissuading a witness conviction and a 2018 first degree residential burglary conviction.

### C. Defendant's Motion for Mental Health Diversion

In January 2022, defendant filed a petition for pretrial mental health diversion pursuant to section 1001.36. He attached an executed document entitled "Mental Health Diversion Agreement" acknowledging that if granted diversion he would abide by any rules or conditions of the program, which could last up to two years. He agreed to attend and keep all appointments and to fully participate in the treatment plan set out by the judge or his treatment provider, including reporting regularly to the plan provider, participating in all activities outlined in his treatment plan, including taking medication, submitting to drug and alcohol testing, and attending mental health and substance abuse treatment, therapy, or supports groups. He also agreed to abide by any changes to his treatment plan over time.

To support his petition, defendant included a December 2021 report from Dr. Kent Caruso, a forensic clinical psychologist, who had personally assessed defendant. Dr. Caruso opined that defendant "suffer[ed] from a trauma-stressor related disorder due

4

to continuous traumatic exposure to extremely violent and dangerous combat situations" while serving multiple tours during the Iraq War after joining the Marine Corps at age 17, when he was too young and psychologically ill-prepared for the task. It was Dr. Caruso's opinion that defendant's "numerous social-occupational adjustment problems and his alcoholism since leaving the Marine Corps were conditions of his service-connected PTSD," and that his combat-associated posttraumatic stress disorder (PTSD) had "adversely and destructively impacted his life" even before being discharged from the Marines for bad conduct. Given defendant's candor during the interview, as well as his insight into his problems and his willingness to accept responsibility for his adult history of self-destructive behavior, Dr. Caruso believed defendant would respond positively to a highly structured, residential treatment program.

Regarding whether defendant posed an unreasonable risk of danger to public safety if treated in the community, Dr. Caruso reported that defendant was an "emotionally disturbed individual" that he believed "would like to change, is motivated to change, and perhaps with appropriate long-term treatment intervention could change enough so that he would no longer pose an unreasonable risk to society or himself." Dr. Caruso further noted that he did not find defendant was prone toward exhibiting sociopathic or psychotic behavior or values, nor did he assess him as narcissistic, thoughtless, callous, or as a ruthless problem solver who was comfortable violating social norms, mores, or otherwise conventional types of problem solving. Dr. Caruso acknowledged that defendant had already served three terms in prison and had received some informal types of treatment intervention and yet continued his patterns of drinking and acting out but emphasized that defendant had never been introduced to the kind and quality of treatment program like the United States Department of Veterans Affairs, Veterans Health Administration (the Department) might offer, and this was most likely because he had never qualified to receive veteran's benefits.

5

At a hearing in February 2022, the court announced a tentative decision to deny the petition, pointing out perceived deficiencies in the petition, including that Dr. Caruso had not actually opined whether defendant's mental health condition was a substantial factor in the charged offenses. The matter was continued for further hearing.

Following the court's tentative ruling, defendant filed supplemental materials to support the petition, including investigative police reports regarding the stabbing, letters of support from the victim and three other friends or family members, as well as photographs of his bedroom where the victim was stabbed.

At the beginning of March 2022, defendant moved to continue the hearing on his diversion petition based on an alleged mix-up in providing additional information to the Department. According to the motion, defendant believed that if he could receive PTSD treatment services through the Department, "he would be able to provide a more robust and more intensive treatment plan for the court to consider during his hearing for his Mental Health Diversion." The court granted a continuance on other grounds.

The People opposed defendant's diversion petition, arguing that defendant had failed to establish a prima facie case under section 1001.36. Although the People agreed defendant suffered from a "substantial mental health diagnosis," they argued defendant did not qualify for diversion because he understood the wrongfulness of his actions, Dr. Caruso never opined that defendant's mental health condition was a significant factor in his criminal conduct, and that defendant had simply been upset with his girlfriend during an argument. The People also argued defendant posed an unreasonable risk of danger to public safety because he stabbed his current girlfriend in the thigh after a domestic violence incident with a former girlfriend where he allegedly hit her nearly 50 times and choked her to unconsciousness; he had a lengthy criminal history and had performed poorly when released on probation or parole; and defendant had not shown that any county agency had agreed to accept responsibility for treating him or delineated what type of treatment he needed. The People attached copies of the police reports from

the current offenses as well as the prior domestic violence incident, Dr. Caruso's report, and defendant's criminal history.

In a second supplemental filing, defendant urged the court to disregard as irrelevant the police reports concerning his prior domestic violence incident. To the extent the court considered the evidence, defendant asked the court to also consider a 2016 psychological evaluation of defendant, which licensed psychologist Dr. Kevin Dugan had prepared for proceedings related to the previous domestic violence incident.

### D. The Diversion Hearing

At a contested evidentiary hearing on the petition in March 2022, defendant did not call as witnesses either of the licensed psychologists who had examined him. Instead, defendant called Deputy Hunter Dyche who testified regarding defendant's appearance and demeanor the day he was arrested, including that defendant smelled of alcohol, had slurred speech, and was fidgety. While defendant appeared to understand the gravity and wrongfulness of his conduct, he had trouble directly answering the deputy's questions.

Defendant, in narrative form, testified on his own behalf. He described his military service beginning when he was 17 years old, including three tours in Iraq in 2004, 2006, and 2007, where he witnessed horrific acts of violence and was under extreme stress. Upon his return from combat, he suffered flashbacks and started drinking heavily.

Sometime in 2007, defendant was first diagnosed with PTSD and the Marine Corps gave him medications, which he refused to take. Defendant's wife eventually left him, stating that "[t]he war fucked you up, you're always drunk." After receiving his wife's letter, defendant got very drunk, crashed his car, and was convicted for felony driving under the influence. As a result, the Marine Corps discharged him for bad conduct in 2008.

Several days after being discharged, defendant was convicted of another felony driving under the influence and was sent to prison. He was released from prison in 2011

7

and struggled with his PTSD and drinking. He continued to have flashbacks and was again convicted of driving under the influence. He denied hitting his former girlfriend 50 times as the police report stated but admitted trying to tamper with a witness related to the incident for which he was convicted. Regarding a 2016 residential burglary conviction, defendant testified that he had a flashback while driving home from work and he kicked in the door where he lived.

Defendant testified that shortly before he stabbed T.M., he had moved to be near family, was going to rehab, and was trying to get sober. He attended Alcoholics Anonymous meetings until the COVID-19 pandemic prevented him from attending. After contacting a fellow Marine to discuss his struggles, defendant started having nightmares again. Although he sought help at the Veterans Services office in Shasta County, the process was slow.

On the morning of the stabbing, defendant's brother told him that their cousin, a fellow combat Marine who struggled after his time overseas, committed suicide. Defendant started drinking heavily as a form of self-medication. Later that day, T.M. came to his trailer to check on him. He wanted to continue drinking and did not want her there, but she refused to leave. He broke glass plates and stabbed the table to try to scare her into leaving. Claiming his memory of what transpired next was "glitchy," defendant testified that he had an injured knee at the time and that he tripped over his kitten, causing him to stumble on the uneven ground and accidentally stab T.M.

Defendant admitted during cross-examination that he had made a conscious decision to scare T.M. when he knew they were in close quarters with small kittens around and that he was unstable on his feet. He also acknowledged that he was aware the situation in the trailer was "extremely dangerous."

E. *Denial of Defendant's Diversion Petition*

After considering the parties' written submissions, including the expert reports, as well as the testimony and arguments at the hearing, the trial court denied defendant's

8

diversion petition. In ruling on the petition, the court initially found that defendant suffered from PTSD, a qualifying mental health disorder. While Dr. Caruso's report did not opine on whether defendant's PTSD substantially contributed to the charged offenses, the court also found that defendant had "marginally met" the standard that his mental health disorder was a substantial factor in the commission of his crimes.

Nevertheless, the court found that no medical expert opined on whether defendant's mental health disorder would respond to treatment within two years, nor had anyone presented the court with a treatment plan suitable for defendant's need or consent to such a treatment plan, which the court characterized as "one of the biggest glaring holes in this Motion."

Finally, the court found that defendant posed an unreasonable risk of danger to public safety as statutorily defined. In so finding, the court emphasized that although Dr. Caruso identified this as a key question in defendant's case, he did not opine that defendant did not pose a danger to public safety; instead, Dr. Caruso simply noted that defendant might benefit from long-term residential treatment of an unspecified kind, which could perhaps lead him to change so he no longer posed an unreasonable risk to society or himself.

The court found defendant's risk to public safety to be "significant," noting the facts of the charged crime, including the use of a deadly weapon, indicated a danger of death or great bodily injury to the victim and to the public. The court further found there was a danger that defendant would commit a "super strike" offense if granted diversion to be treated in the community, citing defendant's criminal history and Dr. Dugan's psychological report as support.

### F. Plea Agreement and Sentencing

Following denial of the diversion petition, and to facilitate a plea agreement to a stipulated term of 24 years in state prison, the parties stipulated to amend the complaint to add the following charges and enhancements by interlineation: three counts of felony

9

vandalism (§ 594, subd. (b)(1); counts 3-5), two counts of corporal injury (§ 273.5; counts 6 & 7), a dangerous weapon enhancement (§ 12022, subd. (b)(1)) as to count 2, and a prior serious felony enhancement (§ 667, subd. (a)). Defendant subsequently pled no contest to all the charges and admitted one prior strike and the special enhancement allegations. The court granted a motion to strike the remaining strike allegation in the interest of justice.

The trial court sentenced defendant to the stipulated term of 24 years in prison, which included the upper term of four years, doubled to eight years for count 2, plus one year for the attached dangerous weapon enhancement; one-third the midterm doubled to two years each for counts 1, 6, and 7; one-third the midterm doubled to 16 months each for counts 3, 4, and 5; and five years for the prior serious felony enhancement. Defendant timely appealed with a certificate of probable cause as to various issues relating to the denial of his petition for pretrial mental health diversion.

DISCUSSION

Defendant contends the trial court abused its discretion when it denied his request for mental health diversion. We disagree.

A. *Legal Background*

In June 2018, the Legislature enacted section 1001.36, which authorized pretrial diversion for defendants with qualifying mental health disorders. (*People v. Frahs* (2020) 9 Cal.5th 618, 626.)[4] The Legislature later amended section 1001.36 to specify that defendants charged with certain crimes, none of which are applicable here, are not

---

[4] Section 1170.91, passed in 2014, mandates that a sentencing court consider trauma resulting from military service, including PTSD, as a mitigating factor when exercising determinate sentencing discretion under section 1170, subdivision (b). (§ 1170.91, subd. (a).) Although defendant notes section 1170.91 in his opening brief, his appellate challenge focuses on whether the trial court erred in denying diversion under section 1001.36.

eligible for diversion.  (*Frahs*, at p. 627 [categorically excluding certain crimes, such as murder and rape, from eligibility].)

The purpose of the statute is:  (1) to increase "diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety"; (2) to allow local discretion and flexibility for counties to develop and implement diversion for individuals with mental disorders across a continuum of care settings; and (3) to provide "diversion that meets the unique mental health treatment and support needs of individuals with mental disorders."  (§ 1001.35, subds. (a)-(c).)

While defendant's appeal was pending, Senate Bill No. 1223 (2021-2022 Reg. Sess.), effective January 1, 2023, amended section 1001.36 to give courts discretion to grant pretrial diversion "if the defendant satisfies the eligibility requirements for pretrial diversion set forth in subdivision (b)" and the court finds "that the defendant is suitable for that diversion under the factors set forth in subdivision (c)."  (§ 1001.36, subd. (a); as amended by Stats. 2022, ch. 735, § 1, eff. Jan. 1. 2023.)  Neither party addressed whether Senate Bill No. 1223's amendments to section 1001.36 apply retroactively to defendant's case, but both cite to the current statutory language in analyzing the propriety of the court's ruling.  Because any changes in the statutory language do not affect the issues raised on appeal,[5] we shall assume for purposes of the appeal, as the parties do, that the newly enacted version of section 1001.36 applies.

As presently enacted, section 1001.36, subdivision (b) provides that a defendant is eligible for pretrial diversion if two criteria are met.  First, the defendant has been

---

[5]  For example, because the trial court found defendant had sufficiently established that he had a qualifying mental health disorder that was a substantial factor in the commission of the offense, any changes that Senate Bill No. 1223 made to section 1001.36 regarding those issues do not affect the outcome here.

diagnosed with a mental disorder, including PTSD, within the last five years by a qualified mental health expert based on an examination of the defendant, the defendant's medical records, arrest reports, or any other relevant evidence. (§ 1001.36, subd. (b)(1).) Second, the defendant's mental disorder was a significant factor in the commission of the charged offense, which, if the defendant has been diagnosed with a mental disorder, the court shall find the mental disorder was a significant factor in the commission of the offense unless there is clear and convincing evidence that it was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense. (§ 1001.36, subd. (b)(2).)

For any defendant who satisfies the above eligibility requirements, the court must then find the defendant is suitable for pretrial diversion if all the following criteria are met: "(1) In the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment. [¶] (2) The defendant consents to diversion and waives the defendant's right to a speedy trial . . . . [¶] (3) The defendant agrees to comply with treatment as a condition of diversion . . . . [¶] [and] (4) The defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (§ 1001.36, subd. (c)(1)-(4).)

Section 1001.36, subdivision (f)(1) permits the temporary or permanent postponement of prosecution to allow the defendant to undergo mental health treatment subject to: (1) the court being satisfied that the recommended inpatient or outpatient treatment program will meet the specialized needs of the defendant; (2) before the court approves of the recommended treatment program it considers the requests of the parties, the needs of the defendant and the interests of the community; and (3) if the court refers the defendant to a county mental health agency but the agency determines it cannot meet the defendant's needs, the court may consider a written declaration instead of live testimony to establish that the program is unable to provide services. (§ 1001.36, subd.

12

(f)(1)(A)(i)-(iii).)  The period of diversion for a defendant charged with a felony, like defendant was here, may not exceed two years.  (§ 1001.36, subd. (f)(1)(C)(i).)

We review a trial court's ruling on a petition for pretrial mental health diversion for abuse of discretion.  (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147; *People v. Moine* (2021) 62 Cal.App.5th 440, 448-449; see *People v. Frahs*, *supra*, 9 Cal.5th at p. 626.)  "A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence."  (*Moine*, at p. 449.)

### B.    Analysis

The trial court denied diversion because (1) no mental health treatment plan was presented for the court to consider; (2) there was no evidence that a treatment plan suitable for defendant's needs would treat defendant's mental health disorder within the required two years or that defendant would comply with any such mental health treatment plan; and (3) defendant posed an unreasonable risk of danger to the public if treated in the community.

While defendant acknowledges the trial court's first two reasons for denying the petition—the absence of a suitable treatment plan or of evidence showing he would comply with any such plan—he argues they are "easily rectifiable" and not an impediment to diversion.  In his view, only the trial court's dangerousness finding is truly at issue.  We are not persuaded.

Neither defendant nor the prosecutor presented the trial court with any mental health treatment program for its consideration even though the trial court had issued a tentative ruling pointing out perceived deficiencies in the petition.  For diversion to be an option, a mental health treatment program must be recommended to the court, and the court must be "satisfied that the recommended inpatient or outpatient program" meets the

13

defendant's particular needs. (§ 1001.36, subd. (f)(1)(A)(i).) Without evidence of a program, neither of these conditions precedent to granting diversion were met.

Indeed, as the trial court recognized, without a treatment plan, the court "would be acting without any guidance whatsoever to order conditions of diversion as to this particular individual and his specific needs." The absence of a treatment plan, the court aptly noted, was "one of the biggest glaring holes" of defendant's petition.

The fact that defense counsel indicated below that defendant was working with the Department to find an appropriate program does not satisfy the conditions precedent to diversion as defendant argues. While it may be true that the Department generally offers various mental health programs, according to Dr. Caruso's report, defendant was not eligible to receive veteran's benefits given his bad conduct discharge from the Marine Corps. And, even though the evidentiary hearing on the diversion petition had been continued multiple times, which provided defendant ample opportunity to try to qualify for benefits, he had not done so by the time of the hearing nor had he identified a particular veteran's program, or any program, for the court to consider that was suitable to treat his mental disorder within the statutory two-year time period. Simply seeking help from the Department was insufficient to satisfy the statute's treatment program requirements.

To the extent defendant cursorily implies that his appointed counsel was ineffective for failing to provide an expert opinion from Dr. Caruso that satisfied the statutory requirements for diversion, we do not address the issue. "When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' " (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

Because we conclude the trial court acted within its discretion in denying defendant's diversion petition based on the lack of a treatment program suitable to

14

defendant's needs, we need not address whether the court's alternative reasons also provided a separate basis sufficient to deny the petition.

DISPOSITION

The judgment as well as the order denying defendant's petition for pretrial mental health diversion under section 1001.36 are affirmed.

 

/s/
BOULWARE EURIE, J.

 

We concur:

 

/s/
HULL, Acting P. J.

 

/s/
KRAUSE, J.